This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**ADUZ HEALTHCARE SERVICES, P.C.,**
**A New Mexico Professional Corporation,**
**NII TETTEH ADDY, as an officer and director of**
**ADUZ HEALTHCARE SERVICES, P.C.**
**and in his individual capacity, and**
**GRACE MBONDE-KANGE, as an officer and director of**
**ADUZ HEALTHCARE SERVICES, P.C.**
**and in her individual capacity,**

     Plaintiffs-Appellees,

v.                                                                 NO. 32,555

**HERBERT U. OJIAKU, M.D.,**
**as shareholder, officer, and director of**
**ADUZ HEALTHCARE SERVICES, P.C.,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**Jane Shuler Gray, District Judge**

Doerr & Knudson, P.A.
Randy Knudson
Portales, NM

Greig & Richards, P.A.

W.H. Greig
Clovis, NM

for Appellee

Caren I. Friedman
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**WECHSLER, Judge.**

{1}     Defendant Herbert Ojiaku appeals the judgment of the district court finding and concluding that he converted monies for his own use and owes his former partners in Aduz Healthcare Services, P.C. (Aduz), Nii Tetteh Addy and Grace Mbonde-Kange (Plaintiffs), $157,387.33 plus interest at a yearly rate of fifteen percent. Defendant argues that the court's application of a spoliation inference was error, that the judgment of the court was not supported by sufficient evidence, that the dismissal of Defendant's counterclaims by partial summary judgment was error, and that both the grant to Plaintiffs of attorney fees and post-judgment interest at the rate of fifteen percent were error. We affirm the judgment of the district court.

**BACKGROUND**

{2}     Unable to continue doing business together, Defendant and Plaintiffs, all doctors, disbanded their family healthcare clinic approximately one year from its

opening.  After Defendant stated his intention to begin billing separately for the patients he saw, Plaintiffs decided to withdraw from the business.  Subsequently, on March 29, 2010, the three partners and their respective counsel met formally, pursuant to the bylaws of the partners' closely held corporation, Aduz.  At that meeting, basic terms of dissolution were agreed upon by a vote of two to one, which was sufficient to bind Aduz.  Defendant cast the contrary vote.  By the terms of the agreement, Defendant was authorized to utilize the office building for his practice for up to ninety days after Plaintiffs left.  A non-party, Rebecca Baeza, was assigned broad financial and accounting duties of Aduz for this period and was granted complete and unfettered access to the tools required to perform this function, including access to the company computer systems, incoming payments, and corporate bank account.  Baeza was authorized to make all deposits of the corporation, to pay or ensure payment of the bills of the corporation, and to provide a detailed accounting.  Defendant was authorized to use the existing corporate structure, but all monies earned from his medical practice were to be deposited first to the corporation, and then timely forwarded to Defendant by Baeza.  Defendant was obligated to account for all cash co-payments received for medical services.

{3}     Defendant almost immediately diverted from the agreed-upon corporate structure by opening two additional bank accounts in the name of Aduz without

3

authorization and without informing Plaintiffs.  Defendant also changed the credit card processing of the corporation to deposit payments into the new bank accounts and, seemingly, diverted one of the payment streams from the authorized Aduz account into one of the accounts controlled solely by Defendant.  Less than one month after the meeting outlining dissolution terms, Plaintiffs filed suit against Defendant seeking an injunction to enforce corporate decisions, to prohibit interference with corporate decisions, an accounting, breach of fiduciary duties, and conversion. Plaintiffs' complaint alleged, in essence, that Defendant seized control of the income stream, denied Baeza access to the mail and corporate billing records, and substantially prevented Baeza from performing the financial and accounting duties assigned to her.

{4}      Pursuant to various motions by both parties, the district court held a pre-trial hearing on May 19, 2010.  The result of that hearing was a July 26, 2010 order for preliminary injunctive relief ordering a full accounting of all records of Aduz by July 29, 2010, including an accounting of the two unauthorized corporate accounts opened and controlled unilaterally by Defendant.  The court also ordered full access to the programs and accounts through which payments for medical services are received. The court's order for production was detailed, including, for instance, disclosure of not only bank statements, but "deposit records, withdrawal records, and checks

4

issued" on "any accounts opened by any of the shareholders which have corporate monies deposited therein[.]" The court also ordered Defendant to provide the initial account set-up records and signature cards for the unauthorized corporate accounts. Additionally, the court ordered the parties to agree on a special master to develop an accounting report for Aduz. Among the duties assigned to the special master were to: (1) detail what monies were earned by each of the doctors prior to their separation, including payments for prior services received after the separation; (2) review and evaluate the monies already received by Defendant and placed into the unauthorized bank accounts; (3) establish a mechanism to delineate the earnings of Defendant for the time period after the separation from the collective earnings prior to the separation; (4) establish an agreement and mechanism whereby the funds earned by Defendant after April 1, 2010 would be retained by or distributed to Defendant; (5) establish an agreement and mechanism whereby the earnings of the three members of Aduz prior to April 1, 2010 would be retained and deposited into the corporate bank account; and (6) contact all insurance companies and providers doing business with the clinic and obtain claim reports from them. Defendant was to provide a weekly accounting to the special master and Plaintiffs for one of the unauthorized bank accounts. We note that, in the time between the April 1, 2010 separation and the eventual order of July 26, 2010, many of the duties of the special master became moot because the separation

5

of the partners was by then nearly four months past and Defendant stayed in the building less than a week after the order.

{5}     Pursuant to a December 1, 2010 hearing on multiple motions and a mediation the following day, the court issued an additional series of orders on December 9, 2010. Among the motions heard was a motion to compel filed by Plaintiffs. Plaintiffs sought production of bank records, particularly deposit slips and copies of checks, from the two unauthorized corporate accounts opened by Defendant—records Defendant did not dispute were to be produced to Plaintiffs under the court order of July 26, 2010. Plaintiffs also sought records of Defendant's personal accounts. Although Defendant testified at deposition that he had no money in any accounts and no assets besides his house, personal accounts with more than $30,000 of recent deposits came to light during discovery, leading Plaintiffs to seek the source of those funds. After receiving briefs and hearing argument on the matter, the court reiterated the order requiring complete and detailed production of records from the unauthorized accounts. The court noted that Plaintiffs scheduled depositions with the banks that maintained relevant accounts in an attempt to get detailed account information from a source other than Defendant, and ordered Defendant to promptly supply anything additional "[s]hould . . . counsel for Plaintiff[s] feel that they have not received the entire file" from the banks. The court also noted that Defendant may have to re-send

6

documents. The court ordered Defendant to provide "*all* records" pertaining to all personal accounts within seven days, including cancelled checks and deposit slips. Under a stipulated order and judgment resulting from the mediation, Defendant was held in contempt, and a judgment was rendered against him for failure to comply with a previous court order to personally pay his share of the mortgage on the office building, totaling $11,116.82. Defendant was also ordered to reimburse Plaintiffs for the shortfall Plaintiffs covered from the sale of the office building. Defendant stipulated to tortious and willful misconduct. Any additional claims between the parties other than the ordered payments by Defendant and the "accounting/audit matter" were dismissed with prejudice. Defendant's counsel was granted leave to withdraw and, from that point, Defendant proceeded pro se.

{6} The court's clear order to Defendant did not end the tussle over discovery. On January 24, 2011, the court held a hearing on a motion to compel filed by Plaintiffs. The court heard argument that Defendant did not produce certain information related to his various Wells Fargo accounts, including deposit slips, thus forcing Plaintiffs to attempt to obtain detailed information from the bank. Plaintiffs were ordered to continue the attempt to obtain the information from Wells Fargo, and Plaintiffs' request for attorney fees related to obtaining this information was taken under advisement.

{7} The special master issued his report on April 13, 2011. The report was based on documents generated from the Aduz AMS billing system. The period covered by the report appears to be March 10, 2010 to July 10, 2010. The report summarized the amounts deposited into the two unauthorized corporate accounts. It established a figure for how much money was achieved in receivables for each of the doctors beginning on March 10, 2010. It did not provide any data on the original corporate bank account and therefore did not provide a basis to account for that money through the report. The report did not delineate between money earned by Defendant for services performed before April 1, 2010, which was corporate property, and that which was received for services performed after. The report notes that there was "a large amount of Accounts Receivable still in the AMS system belonging to all three physicians in the practice" and that it was "evident that these accounts ha[d] not been worked and statements ha[d] not gone out to patients in over a year[.]" Eventually, at the merits hearing, Plaintiffs presented testimony that the report was based on incomplete information and that Defendant did not provide the necessary information to the special master.

{8} On March 20, 2012, the court heard argument on another motion to compel. Claiming not to have received sufficiently detailed disclosure of relevant bank files from the banks, Plaintiffs propounded specific requests for production upon

8

Defendant seeking explanation for specific deposits into Defendant's personal accounts and, again, requesting details about all deposits into the unauthorized corporate accounts. Plaintiffs claimed that Defendant's answers were non-responsive. For example, in response to a request for explanation of certain specific deposits into one of his personal accounts, Defendant wrote:

> All the payments were cash money belonging to me which I got from various legitimate sources, sources so legitimate that I have never lost sleep over them, and I cannot even remember any of the details. Can you prove that the monies belong to your clients? I dare you to.

At the hearing, Defendant asserted that the monies were given to him but that he did not "remember any bit of the sources of those moneys." At another point in the hearing, Defendant stated that he could, in fact, remember people who gave him money but could not attribute specific amounts to any particular person. He did not offer any names during the hearing. The court reminded Defendant that he was required by law to answer to the best of his ability. The court instructed Defendant as follows:

> Here's what I want you to do, doctor. You're going to need to go back to these and sit down and just kind of wrack your brain and come up with who you believe provided you with these monies . . . where it came from . . . and if you have any receipts or paper trail of any sort, if you don't, you don't. But you still have—you're telling me right now, lots of people gave you money. Well surely, you can remember some of those people and where they are, surely you can.

9

By order of the court, Defendant was given thirty days to fully respond to Plaintiffs' requests for production. Plaintiffs' request for attorney fees was taken under advisement.

{9} In response to the court's order, Defendant tendered new responses to Plaintiffs' discovery requests. He revised his answer quoted above to state:

> All the payments were cash money belonging to me which I got from legitimate sources like working part-time as a physician in Carlsbad Medical Center for Apogee Medical Group in 2010. Please, see the accompanying Form-1099-MISC as proof of this income.

In response to a request for detailed information about deposits into one of the unauthorized corporate accounts opened and controlled by Defendant at Wells Fargo, Defendant wrote:

> The requested records have been produced to you by Wells Fargo Bank under subpoena, by your own assertion. Attached is Attorney Greig's letter to me dated April 29, 2011 stating so. I did not have those records, and I signed a court order permitting you to get it all from Wells Fargo.

Defendant's original production was substantively the same:

> It is dumb to request records from me which Wells Fargo Bank has entirely produced to you under Subpoena, by your own assertion. See your letter to me dated April 29, 2011. I did not have those records, and I signed a court order permitting you to get it from Wells Fargo [B]ank, and you did. You do not want this thing to end. It must be paying you good. I got news for you: it is time to go home. You cannot continue this rigamarole indefinitely. It is time to look for another case.

10

On August 7, 2012, Plaintiffs filed a motion to compel, for contempt, and for sanctions on the basis of Defendant's unresponsiveness to discovery under order from the court. Plaintiffs requested attorney fees for the filing of the motion, and asked that the court grant the request for attorney fees taken under advisement by the court on March 20, 2012.

{10}   The merits hearing on the remaining accounting issue was held on August 21, 2012. Defendant testified on his own behalf and called no other witnesses. Defendant admitted that he changed the Trailblazer billing, which handled Medicare, from paying into the authorized Aduz account to one of the unauthorized corporate accounts. Defendant also testified that he removed money from the unauthorized corporate account that he purportedly created to house corporate earnings for services provided prior to Plaintiffs' departure on April 1, 2010 that were received after that date, claiming that he only removed money due to him. Defendant did not offer any further details about specific deposits or sources of funds. Plaintiffs presented evidence that the special master's report was based on incomplete records. Two witnesses for Plaintiffs asserted that all doctors were paid for their services through one account registered to the clinic. Evidence was put on that Plaintiffs and Baeza, Aduz's former accountant and the person who was originally tasked with performing the accounting after the doctors separated, were hindered in their access to the billing

11

programs, records, and company mail in the period following the separation. Baeza testified that Defendant misappropriated corporate funds in the period after separation.

{11} Plaintiffs submitted extensive proposed findings of fact and conclusions of law. Defendant did not submit proposed findings of fact or conclusions of law. The court found that Plaintiffs were due $157,387.33, plus interest computed at fifteen percent yearly, including certain attorney fees for spoliation of evidence. The court also found that Defendant failed to provide an accurate and detailed record of the finances of Aduz from April 1, 2010 forward and that Defendant's "willful failure and refusal to meet his responsibilities and obligations resulted in a complete inability to perform an accurate and complete accounting as ordered by th[e] [c]ourt on December 9, 2010[.]" The court concluded that all evidence within the control of Defendant that was not produced without reasonable explanation would be subject to an inference that such evidence would be favorable to Plaintiffs and unfavorable to Defendant. The court further concluded that Defendant behaved with willful, wanton, and conscious disregard toward the corporation and the individual shareholders and found that he converted money belonging to Plaintiffs for his own use.

**SPOLIATION**

{12} Defendant contends that the district court committed error when it applied a spoliation inference in favor of Plaintiffs. Defendant argues that Plaintiffs could have

accessed the requested information that gave rise to the spoliation inference independently of Defendant. Essentially, Defendant argues that he had no duty to preserve or provide the evidence in question and that, therefore, the spoliation inference improperly shifted the burden of proof from Plaintiffs to Defendant. Our standard of review for a court's imposition of sanctions for spoliation of evidence is abuse of discretion. *Restaurant Mgmt. Co. v. Kidde-Fenwal, Inc.*, 1999-NMCA-101, ¶ 8, 127 N.M. 708, 986 P.2d 504. When reviewing a court's inherent power to impose sanctions for spoliation, our review is deferential. *Id.* "We cannot understate the difficulty of the task litigants face when challenging a district court's choice of sanctions." *Id.* (internal quotation marks and citation omitted).

{13} Citing the California Court of Appeal, our Court has defined spoliation as "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Id.* ¶ 9. The definition offered by the Texas Court of Appeals adds "failure to produce, or failure to explain the non-production of relevant evidence" to the above definition. *MRT, Inc. v. Vounckx*, 299 S.W.3d 500, 510 (Tex. App. 2009). A leading treatise on evidence states that there is no distinction between non-production and spoliation. 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 291, at 228-29 (James H. Chadbourn rev. 1979); *see also* 2 Wigmore, *supra*, § 291, at 228 ("The failure or

13

refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor[.]"). This case concerns a spoliation inference applied by the court consequent to Defendant's failure to produce relevant evidence and inadequate explanation for that failure. *See Torres v. El Paso Elec. Co.*, 1999-NMSC-029, ¶ 54, 127 N.M. 729, 987 P.2d 386 ("It is well settled that when a litigant fails to produce available evidence and no reasonable explanation is made, there is a presumption that such evidence would be unfavorable." (internal quotation marks and citation omitted)), *overruled in part on other grounds by Herrera v. Quality Pontiac*, 2003-NMSC-018, 134 N.M. 43, 73 P.3d 181.

**{14}** Defendant's duty to produce was firmly established by a series of court orders. The court repeatedly and directly ordered Defendant to provide detailed information that would allow Plaintiffs to fully trace the corporate income under the control of Defendant. Up to and through the final hearing, Defendant did not fully comply or provide satisfactory explanation for the non-compliance. Refusal to comply with the court's discovery orders not only prejudiced Plaintiffs but also interfered with the judicial process and undermined the court's authority. *See Weiss v. THI of N.M. at Valle Norte, LLC*, 2013-NMCA-054, ¶ 25, 301 P.3d 875 (stating that an "abuse of the discovery process affects more than private litigants" but also "the integrity of the

court and, when left unchecked, would encourage further abuses" (internal quotation marks and citation omitted)), *cert. denied*, 2013-NMCERT-004, 301 P.3d 859. The court found that Defendant's "willful failure and refusal to meet his responsibilities and obligations resulted in a complete inability to perform an accurate and complete accounting as ordered by this [c]ourt." Given this finding, which is supported by substantial evidence in the record, we decline to say that the court should have chosen a more moderate sanction than a spoliation inference. *See United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094, ¶ 385, 96 N.M. 155, 629 P.2d 231 ("It is not our responsibility as a reviewing court to say whether we would have chosen a more moderate sanction.").

{15} Defendant argues that we should apply the three-factor test for determining whether to impose a sanction for spoliation from *Restaurant*. Defendant further argues that if we did so, we would find that the inference was erroneously applied. The three-factor test from *Restaurant* instructs a court to consider:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

1999-NMCA-101, ¶ 13 (internal quotation marks and citation omitted). The *Restaurant* test does not apply to this case, and thus we do not complete the suggested

15

analysis. In *Restaurant*, we stated that these were the factors courts should consider "before imposing sanctions, in particular dismissal" when "exercising their inherent power to address *prelitigation* spoliation of evidence." *Id.* (emphasis added); *see also Marchman v. NCNB Tex. Nat'l Bank*, 1995-NMSC-041, ¶ 53, 120 N.M. 74, 898 P.2d 709 ("Lesser sanctions [than dismissal], however, may be applied to *any* failure to comply with discovery orders.") (internal quotation marks and citation omitted)). The destruction of evidence in *Restaurant* occurred before the suit was filed. The instant case concerns conduct during the course of litigation in response to court orders for production.

**{16}** The other cases cited by Defendant are similarly unpersuasive. We agree with Defendant that *Segura v. K-mart Corp.*, 2003-NMCA-013, 133 N.M. 192, 62 P.3d 283, is not controlling. *Segura* was a slip and fall case, in which the defendant lost or destroyed the leaky bottle that caused the accident. *Id.* ¶¶ 5-6. In *Segura*, we upheld not a spoliation inference, but a sanction for spoliation consisting of an instruction to the jury that the defendant was negligent. *Id.* ¶ 7. *Segura*, as a negligence case involving a significantly more severe penalty, is not essential to us. *Cockerline v. Menendez*, 988 A.2d 575 (N.J. Super. Ct. App. Div. 2010) and *Ecor Solutions, Inc. v. Department of Environmental Conservation*, No. 106556, 2007 WL 4225413 (NY Ct. Cl. Oct. 31, 2007), are also unpersuasive. *Cockerline* upheld a spoliation inference

in favor of the plaintiff because the court did not agree with the defendant's assertion that the plaintiff was not prejudiced by the loss of data from an automotive accident. Plaintiffs in this case were prejudiced in their accounting action when they were denied detailed information about the flow of corporate income under Defendant's control despite court orders to produce. The *Ecor* court held that no spoliation inference was due when there was no proof that the information for which the plaintiff sought a spoliation inference existed. *Id.* \*6. This case is different. Defendant did not provide any of the names of the sources of the deposits into his personal accounts even though he admitted under questioning by the court that he remembered at least some names.

{17} Defendant asserts that, like the accused spoliator in *MRT*, Defendant had no unfulfilled duty. However, the party seeking a spoliation inference in *MRT*, unlike Plaintiffs, did not request, or make reference to, the production of the evidence that was subsequently destroyed. 299 S.W.3d at 511. The denial of a spoliation inference under the facts of *MRT* is not relevant.

{18} Defendant cites *Mayeux v. Winder* in support of his argument that the court committed error when it found that the burden was on Defendant to prove that all income and deposits placed in the three Aduz accounts and Defendant's Wells Fargo accounts were not earnings of the corporation. 2006-NMCA-028, 139 N.M. 235, 131

17

P.3d 85.  In *Mayeux*, this Court held that in cases in which a transaction creates a facial presumption of self-dealing, shifting the burden of proof from the plaintiff to the defendant may be appropriate.  *Id.* ¶ 19.  The transactions challenged by the plaintiffs in *Mayeux* were held not to be presumptively unfair or even suspect.  *Id.* ¶ 21.  In *Mayeux*, we also held it to be significant that one of the plaintiffs was involved in the accounting of the company.  *Id.* ¶ 24.  We noted the district court's resolution of conflicting testimony and deferred to its findings of fact.  *Id.* ¶¶ 22, 25.  We do the same here.  *Id.* ¶ 13 ("[W]hen there is testimony going both ways, an appellate court will not say that the trial court erred in finding on one side of the issue.") (alteration in original) (internal quotation marks and citation omitted).  In this case, the district court heard evidence and found that Defendant diverted corporate assets into bank accounts that he created without the knowledge or consent of Plaintiffs.  The court received deposition testimony that Defendant claimed not to have liquid assets when he had deposited more that $30,000 into personal accounts.  The court also heard testimony that Defendant hindered attempts to access corporate records in the period when Defendant was in primary control.  The court concluded that Defendant's actions toward Plaintiffs were "willful, wanton and with conscious disregard."  We are not persuaded by Defendant's argument based on *Mayeux* and do

not find error in the court's shifting of the burden of proof to Defendant with regard to the funds in the accounts in question.

**{19}** The district court did not abuse its discretion by sanctioning Defendant with a spoliation inference.

**SUFFICIENCY OF THE EVIDENCE**

**{20}** Defendant contends that the judgment of the district court is not supported by substantial evidence. Defendant argues three points: (1) the district court committed error when it failed to adopt the findings of the special master, (2) the district court's judgment is insufficiently supported by the evidence adduced at trial, and (3) the district court committed error in adopting Plaintiffs' proposed findings of facts and conclusions of law because they are unsupported by the evidence. We address Defendant's three arguments in turn after addressing the standard of review for substantial evidence review.

**{21}** "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Ruiz v. Vigil-Giron*, 2008-NMSC-063, ¶ 13, 145 N.M. 280, 196 P.3d 1286 (internal quotation marks and citation omitted). Under substantial evidence review, "we resolve all factual disputes and indulge all reasonable inferences in favor of the party who prevailed in the [district] court." *Id.*

19

{22} Defendant contends that the special master "did not find that Defendant converted corporate funds to his own use" and argues on that basis that the court committed error in failing to adopt the special master's findings. The factual findings of a special master are reviewed by a district court under a substantial evidence standard and a special master's conclusions of law are reviewed de novo. *State ex. rel. State Eng'r v. Elephant Butte Irrigation Dist.*, 2013-NMCA-023, ¶¶ 16-17, 296 P.3d 1217, *cert. denied*, 2013-NMCERT-001, 299 P.3d 862. Appellate review is conducted under the same standard. *Id.* ¶ 18. After a review of the special master's report, we disagree with Defendant's contention. The special master's report does not find, or allow a conclusive inference, that Defendant did or did not convert corporate earnings. The report does not address at least two of the issues critical to an accounting in this case: (1) given the variable lag time in the receipt of funds from insurance companies, how much of the money received by Defendant after April 1, 2010 was corporate funds; and (2) what happened to the funds after being deposited to the unauthorized corporate accounts solely controlled by Defendant—from the report it is impossible to determine whether Defendant paid any of his bills or otherwise used funds from the account that Defendant purportedly set up for corporate earnings. It is impossible to know how much, if any, of the earnings attributed to Defendant were deposited into the account he set up to house corporate earnings. Of the more than $320,000 of

income received for the period covered by the special master's report, it is not possible to discern how much is corporate income; nor did Defendant suggest such a figure to the court. We note that the only authorized corporate account to which all three members had access is not accounted for in the report at all.

{23} Although the court contemplated a report that would have provided a full accounting, the special master prepared a much more limited document. The court found the report to be "incomplete/insufficient/inadequate/not inclusive." The report does not make or predicate a finding regarding Defendant's misuse of corporate funds and, therefore, does not support the premise of Defendant's argument. Because the special master's report did not make a finding with regard to Defendant's use of corporate funds, the error suggested by Defendant does not exist. *See Johnson v. Gallegos*, 1900-NMSC-001, ¶ 4, 10 N.M. 1, 60 P. 71 ("[The court] has the inherent power to make supplemental and additional findings to those found by its [special master], if such findings are supported by the evidence, so as to clear up any matter, or to set out more fully any circumstances which it deems to be necessary for the proper determination of the cause.").

{24} Defendant argues that the court's judgment is not supported by sufficient evidence and, therefore, the court's judgment is error. Defendant objects that Baeza, Plaintiffs' only witness other than themselves, was led through her testimony by

Plaintiffs' counsel in a manner that was clearly subject to sustainable objection. Defendant did not object to the admission of Baeza's testimony. The failure of Defendant to object to the admission of Baeza's testimony undermines Defendant's claim of error. *See N.M. Att'y Gen. v. N.M. Pub. Serv. Comm'n*, 1984-NMSC-081, ¶ 10, 101 N.M. 549, 685 P.2d 957 ("Failure to object to the admission of evidence operates as a waiver."). As explanation for Defendant's failure to object, Defendant points out that he was pro se at the hearing. Although pro se pleadings are viewed with tolerance, a pro se litigant "is held to the same standard of conduct and compliance with court rules, procedures, and orders as are members of the bar." *Newsome v. Farer*, 1985-NMSC-096, ¶ 18, 103 N.M. 415, 708 P.2d 327. Defendant's choice to represent himself, against the advice of his former attorney and the caution of the court, does not excuse his failure to object.

{25} Defendant argues that the court committed error by failing to exercise independent judgment in adopting virtually all of Plaintiffs' findings and conclusions. Quoting *Pollock v. Ramirez*, Defendant points out that a court "should generally avoid verbatim adoption of all the findings and conclusions submitted by a party." 1994-NMCA-011, ¶ 28, 117 N.M. 187, 870 P.2d 149. *Pollock* goes on to state that the adoption of verbatim findings is not reversible error when the findings are supported by sufficient evidence. *Id.* Defendant contends that fifty-four findings are

unsupported by evidence in the record but does not provide an evidentiary analysis of even one. At bottom, Defendant's argument seems to rest not on insufficiency of the evidence in the record, but, again, on the manner of Baeza's testimony which, Defendant argues, tracks the findings of fact through leading questions. We have reviewed several of the findings that Defendant contests and conclude that substantial evidence in the form of testimony from Plaintiffs supports the court's findings. In the absence of citation to the record and evidentiary analysis by Defendant, we decline to do more. *See Muse v. Muse*, 2009-NMCA-003, ¶ 42, 145 N.M. 451, 200 P.3d 104. ("We are not obligated to search the record on a party's behalf to locate support for propositions a party advances or representations of counsel as to what occurred in the proceedings."). We also note that Defendant did not provide alternative findings of fact or conclusions of law. The district court did not commit error in adopting the Plaintiffs' proposed findings of fact.

{26} Defendant contends that the court "dispensed with the rules in numerous orders entered in this case." Defendant argues that by signing orders and a judgment "that contain no evidence that they had been submitted to Defendant" the court violated Rule 1-058(C) NMRA and local rule LR5-202(C) NMRA. Under LR5-202(C)

> [o]rders and judgments will not be signed by the judge unless they have been initialed by attorneys for all parties to the cause or pro se parties. Should the attorney for any party fail or refuse to so initial a proposed order or judgment within five (5) working days, the attorney submitting

23

the proposed order shall certify to the court that opposing counsel or pro se party has failed or refused to initial the same.

Rule 1-058(C) states that "[i]n all events, before the court signs any order or judgment, counsel shall be afforded a reasonable opportunity to examine the same and make suggestions or objections." First, we note that Defendant does not cite to the record as to which of the numerous orders was not submitted to him for approval. *See Muse*, 2009-NMCA-003, ¶ 42 ("We are not obligated to search the record on a party's behalf to locate support for propositions a party advances or representations of counsel as to what occurred in the proceedings."). We also note that Defendant does not indicate that he filed any written objection to any of the orders or the judgment that were purportedly filed without submission to him. With regard to the final judgment, we observe that a presentment hearing was held. *See In re Adoption of Homer F.*, 2009-NMCA-082, ¶ 28, 146 N.M. 845, 215 P.3d 783 ("[T]he purpose behind Rule 1-058 and LR-202(C) is to ensure that the parties have notice of the language on an order before its entry so that if there is a disagreement, a presentment hearing can be held."). Defendant did not attend. Defendant informed the court that he would be out of the country and asked the court to reschedule. Defendant stated that he was "eager to confront Plaintiffs as they seek from the [c]ourt to rob Defendant of whatever crazy amount of money that is in their minds" and asked for a postponement of at least two weeks. Upon his return, Defendant chose not to file an objection to the judgment.

24

Rule 1-060 NMRA provides for potential relief from final judgment or order for, among other reasons, "any. . . reason justifying relief from the operation of the judgment." Rule 1-060(B)(6). Defendant did not file such a motion. We decline to find error on the basis that the court violated Rule 1-058(C) or LR5-202(C).

**DISMISSAL OF DEFENDANT'S COUNTERCLAIMS**

**{27}** Plaintiffs were granted partial summary judgment on Nov 3, 2010. Defendant contends that the court committed error in granting partial summary judgment on Defendant's counterclaims for injunctive relief, breach of fiduciary duty, conversion, accounting and appraisal, prima facie tort, and negligence. Defendant argues that because the court did not discuss the individual counterclaims brought by Defendant and because the order was impermissibly "rife with factual determinations" the court's grant of partial summary judgment was improper. We decline to find error because, pursuant to a hearing on December 2, 2010, the parties stipulated to dismiss with prejudice all claims other than the "accounting/audit matter" and a then pending claim for payment by Defendant.

**ATTORNEY FEES**

**{28}** Defendant contends that the award to Plaintiffs of attorney fees and costs was error. Plaintiffs were awarded attorney fees and costs from the date of the December 9, 2010 order granting the motion to compel filed by Plaintiffs to enforce the order of

July 26, 2010. The court made the award to Plaintiffs on the basis of Defendant's spoliation of evidence and as sanctions. The court found that the actions of Defendant toward Plaintiffs were willful, wanton, and with conscious disregard. Defendant's argument with regard to attorney fees is built on the foundation of Defendant's other arguments: that is, because, according to Defendant, the court committed error in sanctioning Defendant with a spoliation inference and also because there was insufficient evidence to support the judgment of the court, Defendant contends that there was insufficient evidence of bad faith conduct on the part of Defendant to support an award of attorney fees and costs under New Mexico law.

{29} Our Supreme Court recognizes that both trial and appellate courts have "inherent power to impose a variety of sanctions on both litigants and attorneys in order to regulate their docket, promote judicial efficiency, and deter frivolous filings." *State ex rel N.M. State Highway & Trans. Dep't v. Baca*, 1995-NMSC-033, ¶ 11, 120 N.M. 1, 896 P.2d 1148 (internal quotation marks and citation omitted). The power to command the obedience of litigants is requisite to effective performance of judicial functions. *Id.* The inherent authority of a court "extends to all conduct before that court and encompasses orders intended and reasonably designed to regulate the court's docket." *Id.* ¶ 27. A sanction awarding attorney fees has both a punitive and compensatory aspect, *id.* ¶ 22, and may be awarded in order to "vindicate [the court's]

26

judicial authority and compensate the prevailing party for expenses incurred as a result of frivolous or vexatious litigation." *Id.* ¶ 12. An award of attorney fees as a discovery sanction is reviewed under an abuse of discretion standard. *Id.* ¶ 26.

{30} Defendant was ordered to reimburse an amount of Plaintiffs' attorney "fees and costs as sanctions and for his spoliation of evidence." Given the court's need to issue recurrent orders to Defendant to disclose, and Defendant's ultimate unwillingness to disclose important information or explain his lack of disclosure, the court did not abuse its discretion in awarding attorney fees to Plaintiffs.

{31} Defendant also contends that the court committed error by awarding attorney fees and costs because Plaintiffs did not provide sufficient detail of their fees and costs. Defendant argues under *Kennedy v. Dexter Consolidated Schools* that a party seeking attorney fees has the burden of proving such fees by meticulous, contemporaneous records how the time was spent. 2000-NMSC-025, ¶ 35, 129 N.M. 436, 10 P.3d 115. However, *Kennedy* was a case involving a claim for statutory attorney fees under 42 U.S.C. § 1988 (1998). This case is different. It is more like *Weiss*, in which this Court upheld a $25,000 sanction for failure to comply with reasonable discovery requests and misrepresentations to the court. 2013-NMCA-054, ¶¶ 22-23. In *Weiss*, we upheld the award of sanctions as reasonable despite the failure of the plaintiffs to itemize costs in part because the sanctions related to an affront to

27

the court and the judicial process. *Id.* ¶¶ 25-26. Given the court's finding that Defendant defied the court's orders to disclose, the court did not abuse its discretion under its inherent powers in sanctioning Defendant, despite Plaintiffs' failure to provide a detailed accounting of their fees and costs.

{32} Defendant also contends that the court's award of expenses was error and states that there does not appear to be authority for such an award under New Mexico law. We decline to find an abuse of the court's discretion and note that in *Marchman*, our Supreme Court affirmed an award of "expenses and fees" incurred in pursuing a motion for sanctions. 1995-NMSC-041, ¶ 53.

{33} Defendant further contends that the court committed error in applying interest to the judgment at the rate of fifteen percent per annum. Under NMSA 1978, Section 56-8-4(A) (2004), interest is generally allowed at a rate of eight and three-quarters percent, but, under Section 56-8-4(A)(2), interest on a judgment based on "tortious conduct, bad faith or intentional or willful acts" is calculated at fifteen percent. The court specifically found that Defendant's conduct toward Plaintiffs was willful, and Defendant stipulated to tortious and willful misconduct. The court did not abuse its discretion in awarding interest at a rate of fifteen percent.

**CONCLUSION**

28

{34} For the foregoing reasons we affirm the judgment of the district court.

{35} **IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**

_____
**J. MILES HANISEE, Judge**